# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v WARNER

Docket No. 163805. Argued on application for leave to appeal October 5, 2023. Decided July 11, 2024.

Damon E. Warner was charged in 2016 in the Eaton Circuit Court with first- and second-degree criminal sexual conduct (CSC-I and -II), MCL 750.520b(1)(b)(*i*) and MCL 750.520c, for allegedly sexually assaulting his minor stepdaughter. The investigation that gave rise to the charges involved three police interrogations lasting a total of about six hours, in which the investigating officers used techniques including sexualizing the victim to gain defendant's trust and falsely indicating that the police had associated defendant's DNA with the alleged conduct. Defendant denied the accusations during the first interrogation, but he signed a confession that the police had written for him during the second interrogation, and he confirmed that the confession was accurate during the third interrogation. A jury found him guilty of CSC-II but was unable to reach a verdict regarding the CSC-I charge. Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to 10 to 30 years' imprisonment. After sentencing, the prosecutor moved to dismiss the CSC-I charge by entry of a *nolle prosequi* order. On August 14, 2017, the trial court granted the prosecutor's motion and dismissed the CSC-I charge without prejudice. Several years later, the Court of Appeals, SWARTZLE, P.J., and MARKEY, J. (RONAYNE KRAUSE, J., dissenting), in an unpublished per curiam opinion issued March 21, 2019 (Docket No. 340272), granted defendant a new trial after he successfully appealed his CSC-II conviction. After the trial date was scheduled, the prosecutor moved the trial court to amend the information to reinstate the CSC-I charge that had been dismissed. The trial court, Janice K. Cunningham, J., granted the motion over defendant's objections. Before trial, defendant moved the trial court to provide him with an expert on false confessions and to conduct an *in camera* inspection of the victim's medical and psychological records. The court initially agreed that an indigency hearing would be appropriate but ultimately denied both motions, ruling that the proposed expert testimony would be inadmissible under *People v Kowalski*, 492 Mich 106 (2012). After the trial, a jury found defendant not guilty of CSC-II but guilty of CSC-I, and defendant was sentenced to 20 to 40 years' imprisonment. Defendant appealed. The Court of Appeals, CAMERON, P.J., and REDFORD, J. (BORRELLO, J., concurring in result), held that the trial court had not violated defendant's right to due process by denying his motion to appoint an expert in false confessions. The Court of Appeals agreed that the trial court had misinterpreted *Kowalski* as creating a categorical ban on false-confession testimony, but it held that the trial court had not abused its discretion by denying defendant's motion because defendant had not shown a reasonable probability that the denial of

expert assistance resulted in a fundamentally unfair trial. 339 Mich App 125 (2021). Defendant applied for leave to appeal in the Supreme Court, which ordered and held oral arguments on the application. 510 Mich 936 (2022).

In an opinion by Justice BOLDEN, joined by Chief Justice CLEMENT and Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court, in lieu of granting leave to appeal, *held*:

In a trial in which the veracity of a confession is central, it is fundamentally unfair when an indigent defendant is deprived of an adequate opportunity to present their claims fairly by being denied funding to support necessary expert assistance on false confessions. In this case, defendant's proposed expert would have identified circumstances and techniques tending to result in false confessions, which are beyond the understanding of the average juror. Defendant's confession was the only corroborating evidence for the complainant's allegations, and it was central to the prosecution's case. Accordingly, defendant showed a reasonable probability that his proposed expert would aid his defense and that, without funding to secure such an expert, his trial would be fundamentally unfair. The Court of Appeals judgment was reversed, and the case was remanded for further proceedings.

1. Under *Ake v Oklahoma*, 470 US 68 (1985), when an indigent defendant requests funds for an expert witness, the defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. In addition, the defendant should inform the court why the particular expert is necessary. Though the defendant is not expected to provide the court with a detailed analysis of the assistance an appointed expert might provide, a defendant's bare assertion that an expert would be beneficial cannot, without more, entitle them to an expert. The *Ake* standard for evaluating an indigent criminal defendant's request for expert assistance was adopted by the Michigan Supreme Court in *People v Kennedy*, 502 Mich 206 (2018).

2. The trial court misinterpreted *Kowalski* to deny defendant's motion to fund his expert witness. In *Kowalski*, the Court upheld the trial court's exclusion of proposed expert testimony on false confessions not because false-confession testimony is per se inadmissible, but because the expert testimony at issue was based on sources that were unreliable, were prone to inaccuracy or bias, had not been subjected to scientific peer-review, and were based on unreliable methodology. *Kowalski* did not amount to a categorical ban on all false-confession testimony, and the trial court erred by holding otherwise in this case.

3. Defendant demonstrated a reasonable probability that his proposed expert would help his defense and that the absence of that expert would result in a fundamentally unfair trial. Despite the Court of Appeals' contention, defendant was not required to show that he would be unable to present his defense without expert assistance under *Ake* and *Kennedy*. Instead, defendant identified other ways in which the expert would assist the defense and demonstrated that the lack of expert assistance would render his trial fundamentally unfair. In particular, defendant established that the veracity of his confession was a significant factor at trial. Defendant's motion for an expert correctly anticipated that a major part of the prosecution's case-in-chief would be his confession and sworn statements to the police, given that his confessions were the only corroborating evidence of the complainant's allegations. Thus, a central focus of the defense was to cast doubt on his

confessions. Defendant offered an expert in false confessions who could testify about the characteristics associated with false confessions and interviewer bias. After the trial court indicated that it would only allow testimony about defendant's individualized susceptibility to coercive interviewing techniques based on his specific psychological profile, the proposed expert agreed to do the relevant testing so he could provide such testimony. Defendant did not merely make a bare assertion that an expert would be beneficial, but supplied other facts that supported this theory, including the conditions of, and techniques employed during, his interrogations. Defendant explained that the defense needed its own expert in false confessions to explain to the jury that his confession had the characteristics of coercion because the manner in which a confession is obtained and how a defendant's psychological makeup may have affected the defendant's statements is beyond the understanding of the average juror and may be relevant to the reliability and credibility of a confession. Moreover, even if the expert did not ultimately testify, expert consultation could have provided defendant valuable information about how to otherwise understand evidence that would be presented to the jury, such as through providing advice regarding cross-examination of the prosecution's witnesses about their techniques. Finally, because defendant's confessions were the only evidence presented corroborating the complainant's allegations and because the defense theory was that those confessions were obtained through coercive tactics, the denial of defendant's request for funds to retain a false-confessions expert created a reasonable probability of a fundamentally unfair trial. In sum, without this expert, due process would not be served, because the veracity of defendant's confession was a significant factor at trial. If defendant was indigent when he moved for funds for an expert in false confessions, his due-process rights were violated when his motion was denied.

4. The issues presented to the Court were ripe and not hypothetical, and their resolution did not constitute an advisory opinion. The actual issue before the Court was whether the trial court abused its discretion when it denied defendant's motion for expert funds. Thus, the appeal necessarily concerned both whether the trial court interpreted *Kowalski* correctly and whether the Court of Appeals interpreted *Kennedy* correctly. These issues were litigated, caused harm by being erroneously decided, revealed confusion, and were fully ripe for review.

Court of Appeals judgment reversed; case remanded to the Eaton Circuit Court for further proceedings.

Justice ZAHRA, joined by Justice VIVIANO, dissenting in part, agreed with the majority's decision to deny leave with respect to defendant's argument that the prosecutor could not retry him on the charges that had been dismissed by *nolle prosequi* without refiling an information, but disagreed with the opinion in all other respects. Specifically, he disagreed with the majority's issuance of what he characterized as an advisory opinion on an unripe legal issue, explaining that it was inappropriate for the majority opinion to decide the legal impact of defendant's indigency while the existence of any such indigency was uncertain and hypothetical. He also disagreed that defendant had established a reasonable probability that an expert would be of assistance to his defense and that his trial was fundamentally unfair without a state-funded expert witness, considering the totality of the circumstances surrounding the police interviews and defendant's confession. He noted that defendant identified no evidence to suggest that his confession was false or the product of coercion, but rather asked for an expert to help him create and flesh out an argument supported by nothing more than his own bare assertions. Justice ZAHRA therefore

concluded that defendant was not entitled to relief, even if defendant was indigent when he moved for expert funding.  He would have denied leave to appeal because, although portions of the Court of Appeals opinion were flawed, the panel reached the correct result.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 11, 2024

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                                                No. 163805

DAMON EARL WARNER

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

BOLDEN, J.

In this case, we decide whether a trial court denied an indigent defendant the opportunity to fund an expert witness whose testimony would be integral to fundamental issues of the trial. The Court of Appeals held that the trial court did not err when it denied

defendant's motion to fund an expert witness. We disagree. We reverse and remand this case to the Eaton Circuit Court for further proceedings not inconsistent with our opinion.[1]

## I. FACTS AND PROCEDURAL HISTORY

Defendant Damon Earl Warner was convicted of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b)(*i*), for allegedly assaulting his stepdaughter. In December 2015, defendant's stepdaughter "PG" told her mother that defendant had sexually assaulted her. PG alleged that defendant first assaulted her in 2011 when PG was 13 years old. PG claimed that defendant came into her bedroom, "pushed [her] on the bed," "pulled down [her] pants," and "stuck his penis into [her] vagina," though she later testified that she had felt no penetration. PG also claimed that defendant assaulted her again in their dining room a few months after the first alleged assault. Regarding this alleged incident, PG testified that defendant "came up behind [her] and put his hands down [her] pants and up into [her] vagina."

PG disclosed these allegations to her mother, father, and stepmother, but law enforcement was not notified until PG told her school guidance counselor. In January 2016, Detective James Maltby of the Eaton County Sheriff's Office began his investigation by interviewing PG. Defendant agreed to questioning and was interrogated at the sheriff's department for about an hour on April 4, 2016. Detective Maltby testified that he typically "use[d] a few different techniques" during such interrogations to "get the person . . . to talk," which included withholding information and establishing "a rapport building, buddy

---

[1] Defendant also argued that the prosecutor could not retry the charges that had been dismissed by *nolle prosequi* without refiling an information. We are not persuaded that this Court should review this question, and we deny leave as to this issue.

system." His techniques also included "try[ing] to sexualize the victim" so that a suspect would think Detective Maltby was "looking at it from his point of view." Defendant maintained throughout this interrogation that he had done nothing wrong and agreed to a second interrogation.

On May 5, 2016, Detective Sergeant Derrick Jordan conducted an "MSP [Michigan State Police] special interview" with defendant, while Detective Maltby watched from a monitor in a separate room. Detective Sergeant Jordan began the interrogation by reading defendant his *Miranda*[2] rights. Like Detective Maltby in the previous interrogation, Detective Sergeant Jordan also used techniques he thought would gain defendant's trust, including victim-blaming. Detective Sergeant Jordan testified that these techniques used statements like, "I knew the victim liked him, I knew the victim was promiscuous, I knew the victim was sexually active," despite knowing nothing about the alleged victim. This interrogation lasted a couple of hours. Defendant eventually admitted that he and PG were "wrestling around," at which time PG asked him whether he "want[ed] to feel her p****" and then "took his hand and put it down in her pajama pants and told him that she was wet, she was horny and on fire."

At some point, Detective Sergeant Jordan "wrote out [a] statement, . . . which the defendant gave." Detective Sergeant Jordan drafted the statement instead of allowing defendant to draft his own written confession; Detective Sergeant Jordan stated that writing the statement for the defendant was another purposeful interrogation technique. After drafting, Defendant Sergeant Jordan "went over the statement with the defendant to make

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

sure that it was accurate[.]" Defendant wrote "Yes" on the document indicating that the statement was true and voluntary. According to Detective Sergeant Jordan, the statement summarized what defendant said only at the end of the interrogation, not throughout its entirety.

The full interrogation was not recorded because, according to Detective Sergeant Jordan, the Michigan State Police "didn't have the technology at that time[.]" However, once Detective Maltby sensed defendant was about to confess, he began recording the monitor he was watching from a separate observation room with his phone. The recording was 10 minutes long and was introduced into evidence.

Defendant later testified that the statement made during the second interrogation was false. Though defendant admitted that he would wrestle with PG when she was younger, he stated that he only did it in the presence of his wife. Defendant claimed that he made up the wrestling narrative in his statement because he was "tired of being badgered about the same questions over and over, and they wouldn't take no for an answer" and "they wasn't gonna quit until they got somethin' to help them." PG also confirmed that they would sometimes "play wrestle," but never outside of the presence of her mother.

On May 16, 2016, Detective Maltby conducted a third interrogation with defendant. Maltby again employed some of the techniques used during the first two interrogations. Detective Maltby told defendant he understood why defendant lied about the wrestling incident in order to keep defendant talking. Detective Maltby then lied to defendant by telling defendant that the police had associated defendant's DNA with the incident alleged by PG. Defendant told Detective Maltby the statement he gave to Detective Sergeant Jordan during the second interrogation was accurate. Though Detective Maltby suggested

during this third interrogation that defendant had left aspects of the incident out of his prior statements, including that defendant had penetrated PG and that her pants were off or pulled down, defendant insisted that was not true. Defendant testified that he only confirmed that his statement to Detective Sergeant Jordan was correct because he "knew that they wanted somethin', and . . . [t]here was never no questions about anything else other than what I had spoken to Mr. Maltby about."

In August 2016, defendant was arrested and charged with CSC-I and second-degree criminal sexual conduct (CSC-II), MCL 750.520c. At trial, in response to a juror question during deliberations, the trial court instructed the jury that it could find defendant guilty of one count on the basis of conduct charged under the other. But the trial court failed to instruct the jury that it must unanimously agree that the same conduct supported the conviction to reach that verdict. Defendant was found guilty of CSC-II, and the trial court declared a mistrial on CSC-I because the jury could not reach a verdict on that count. After sentencing, the prosecution moved to dismiss the CSC-I charge via *nolle prosequi*. The trial court granted the prosecution's motion, dismissing the CSC-I count without prejudice.

Defendant appealed his conviction. The Court of Appeals vacated his conviction and ordered a new trial on the basis of his attorney's ineffectiveness for failing to request a jury instruction on unanimity. *People v Warner*, unpublished per curiam opinion of the Court of Appeals, issued March 21, 2019 (Docket No. 340272). The trial court vacated defendant's conviction and sentence and ordered a new trial.

Before the second trial, defendant moved for funds to retain an expert witness in false confessions. Because a large part of the prosecution's case was based on defendant's confession, defendant explained that he needed the expert in false confessions to support

5

his defense. Defense counsel asserted that they required the resources to fund the expert testimony to explain "why somebody could be coerced into making a confession when they were worn down." Defendant's motion identified two potential experts, Dr. Richard Leo and Dr. Brian Cutler, noting that either could testify about the attributes associated with false confessions and interviewer bias. Specifically, Dr. Leo would testify about police interrogation techniques and false confessions, while Dr. Cutler would perform psychological testing on defendant and testify about "the psychology of whether the attributes of a false confession are present."

The prosecution opposed defendant's motion, arguing that the proffered expert testimony was inadmissible under *People v Kowalski*, 492 Mich 106; 821 NW2d 14 (2012). Notably, the *Kowalski* Court found one of the proposed experts here, Dr. Leo, unreliable because his methodology was improper. *Id*. at 133 (opinion by MARY BETH KELLY, J.). Defense counsel in this case ultimately agreed that Dr. Leo's testimony was "out" but argued that Dr. Cutler should be able to testify. The prosecution argued that *Kowalski* required the trial court to exclude as inadmissible generalized false-confession testimony and that the testimony of defendant's proposed experts would be inadmissible because they did not purport to have performed psychological testing on this specific defendant. Because defendant failed to prove that this evidence existed or could be produced, the prosecution asked the trial court to deny defendant's motion.

A hearing was held on the motion. At the hearing, the trial court sua sponte expressed concern that the county would be required to pay for an expert when defendant had two retained attorneys to represent him at trial. Defendant's attorney responded to those concerns by explaining that he was not presently being paid for his legal services and

6

would waive all fees to secure witness funds for his client. The trial court declined that invitation and further explained that defendant "had a court-appointed attorney . . . and he chose to hire you. So, somewhere there's money." The trial court then noted that an indigency hearing would be required before the trial court could determine whether to approve funds for retaining Dr. Cutler. Defense counsel agreed that an indigency hearing would be appropriate. The trial court stated that it believed defendant was "correct on this final motion" and entitled to a *Daubert* hearing, but it expressed reservations about providing funds for a potentially expensive expert.[3] The trial court noted that a follow-up hearing would be held.[4]

However, before the motion hearing concluded and before any follow-up hearing was scheduled, the prosecution interjected that Dr. Cutler's testimony on false confessions would not be admissible under *Kowalski*. Ultimately, since the trial court agreed with the prosecution during the motion hearing that Dr. Cutler's testimony would not be admissible, no ensuing hearing was held, no supplemental briefs were accepted on the matter, and defendant's motion was denied on the record "pursuant to *Kowalski*."

During the second trial, the prosecution called and qualified Dr. Thomas Cottrell as "an expert in the dynamics of child sexual abuse and perpetrator tactics or sex offender

---

[3] A *Daubert* hearing is a pretrial hearing conducted by a trial court in exercising its role as a gatekeeper to ensure that evidence that is admitted into trial meets reliability characteristics outlined in MRE 702. See *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993); see also *Kowalski*, 492 Mich at 140 (opinion by MARY BETH KELLY, J.).

[4] The trial court specified that there were two separate issues to be addressed: the need for a *Daubert* hearing, and whether defendant was "entitled to ask the county to pay" for his expert. The trial court did not resolve either issue.

dynamics." The prosecution again introduced evidence of the police interrogations and defendant's statement. Detective Sergeant Jordan and Detective Maltby testified about the techniques they used in defendant's interviews. In closing, the prosecution focused on Detective Maltby's phone recording of defendant's confession and urged the jury to review the video and "watch the defendant's body language as he's admitting to what he did." The jury found defendant guilty of CSC-I and not guilty of CSC-II.

Defendant appealed, challenging the reinstatement of the CSC-I count and the denial of his right to due process when his pretrial motion to fund an expert witness was denied. Notably, defendant argued that the trial court misinterpreted *Kowalski* in denying his motion to fund an expert witness.

In a published opinion, the Court of Appeals majority held that the trial court did not violate defendant's right to due process by denying his motion to appoint an expert in false confessions. *People v Warner*, 339 Mich App 125; 981 NW2d 733 (2021). The Court of Appeals agreed with defendant that the trial court misinterpreted *Kowalski*, which did not create a categorical ban on false-confession testimony but rather addressed whether the trial court had properly applied the rules of evidence following a *Daubert* hearing. *Id*. at 147. However, the panel held that the trial court in this case had not abused its discretion by denying defendant's motion because defendant did not show a reasonable probability that the denial of expert assistance would result in a fundamentally unfair trial.

Defendant applied for leave in this Court. We scheduled oral arguments on the application, asking the parties to address:

> (1) whether, under MCL 767.29 and MCR 6.112(H), a trial court may amend an information, over objection, to include a charge that was dismissed pursuant to an order of *nolle prosequi*, without beginning the proceedings

8

anew, "unless the proposed amendment would unfairly surprise or prejudice the defendant," MCR 6.112(H); (2) if so, whether the Eaton Circuit Court erred by doing so in this case and whether any error was harmless; and (3) whether the trial court abused its discretion by denying the defendant's motion to appoint an expert in false confessions. [*People v Warner*, 510 Mich 936, 936 (2022)].

## II. ANALYSIS

### A. STANDARD OF REVIEW

Whether a defendant was denied due process by the trial court's refusal to fund an expert witness presents a question of constitutional law that this Court reviews de novo. *People v Kennedy*, 502 Mich 206, 213; 917 NW2d 355 (2018). De novo "means that this Court reviews the legal issue independently without deference to the lower court." *People v Posey*, 512 Mich 317, 332; 1 NW3d 101 (2023), citing *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

### B. BACKGROUND ON FUNDING AN EXPERT WITNESS

"The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense[.]" *Kowalski*, 492 Mich at 139 (opinion by MARY BETH KELLY, J.) (quotation marks and citation omitted). In *Kennedy*, 502 Mich at 210, this Court adopted the standard put forth by the United States Supreme Court in *Ake v Oklahoma*, 470 US 68, 77; 105 S Ct 1087; 84 L Ed 2d 53 (1985), for evaluating an indigent criminal defendant's request for "expert assistance."

When an indigent defendant requests funds for an expert witness, they must show "something more than a mere possibility of assistance from a requested expert . . . ." *Kennedy*, 502 Mich at 227 (quotation marks and citation omitted). Specifically, "a defendant must show the trial court that there exists a *reasonable probability* both that an

9

expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id*. (quotation marks and citation omitted; emphasis added). "In addition, the defendant should inform the court why the particular expert is necessary." *Id*. (quotation marks and citation omitted). Though the defendant is not "expected to provide the court with a detailed analysis of the assistance an appointed expert might provide," a "defendant's bare assertion that an expert would be beneficial cannot, without more, entitle him or her to an expert[.]" *Id*. at 226-227 (quotation marks and citation omitted). *Ake* instructs that due process requires, for example, that when a defendant's sanity will be "*a significant factor at trial*, the State must . . . assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and *assist in evaluation, preparation, and presentation of the defense*." *Ake*, 470 US at 83 (emphasis added).[5]

## C. IMPROPER DENIAL OF FUNDS TO RETAIN AN EXPERT WITNESS

Though the Court of Appeals correctly rejected the trial court's interpretation of *Kowalski*, it erred in its analysis of what a defendant needs to prove to receive court-funded expert assistance.[6] Here, defendant established a reasonable probability that his requested

---

[5] Of course, this case is not about a defendant's sanity or the need for a psychiatrist, but the underlying principles are the same. See, e.g., *Kennedy*, 502 Mich at 219 & n 30 (holding that *Ake* applies beyond psychiatric experts). The due-process right to a fair trial requires assurance that trial courts do not prohibit defendants from retaining material experts who will appropriately support defendants' defenses.

[6] The dissent proceeds as if the issue before us is whether the investigators' techniques led to a false confession. It is telling, for example, that the dissent relies on caselaw concerning motions to suppress. See, e.g., *People v Cipriano*, 431 Mich 315; 429 NW2d 781 (1988). But nowhere do we suggest that this case is about whether the confession should have been suppressed because it was involuntary or coerced. Nor is this case about whether

expert would aid his defense and that, without such assistance, his trial would be rendered fundamentally unfair.[7] So, we reverse the Court of Appeals judgment and remand this case to the Eaton Circuit Court to determine whether defendant was indigent when he filed his motion. If the court determines that defendant was indigent when the motion was filed, he is entitled to a new trial.

As defendant notes and the Court of Appeals held, the trial court misinterpreted *Kowalski* to deny defendant's motion to fund his expert witness. In *Kowalski*, the trial court held a *Daubert* hearing to determine whether the proposed experts' testimony would be admissible under MRE 702, then excluded the testimony. *Kowalski*, 492 Mich at 112, 115-117 (opinion by MARY BETH KELLY, J.). The *Kowalski* Court upheld the trial court's ruling not because false-confession testimony is per se inadmissible, but because the expert testimony at issue was based on "sources [that] were unreliable because they were prone to inaccuracy or bias and, in nearly all instances, had not been subjected to the rigorous

---

defendant's confession is false. Our opinion is limited to the question of whether the trial court erred when it denied defendant's motion to appoint Dr. Cutler. In other words, we limit our decision to whether defendant is entitled to funds to consult an expert to *assist* in the presentation of his defense. Although the expert involved in this case is a false-confessions expert, this analysis is meaningfully distinct from a voluntariness analysis.

[7] The parties do not dispute that the erroneous denial of an indigent defendant's pretrial request for funds to consult with an expert is a constitutional error to be resolved by a showing of harmlessness beyond a reasonable doubt. Without deciding whether this error is subject to a harmlessness test, having reviewed the total record, we agree with defendant that the prosecution has not demonstrated that the error was harmless beyond a reasonable doubt. The evidence the prosecution presented at trial largely concerned defendant's confession and, if defendant was indigent, the trial court's decision deprived defendant of the ability to call or consult with an expert who would provide guidance concerning false confessions.

11

standards of scientific peer-review." *Id*. at 133. The trial court also raised concerns with the proposed expert's "unreliable methodology," which the trial court asserted led to conclusions consistent with the expert's preconceived beliefs instead of results derived through a reliable scientific method. *Id*. Thus, in *Kowalski*, the exclusion of the testimony was a reasonable and principled outcome and not an abuse of discretion. *Id*. *Kowalski* did not amount to a categorical ban on all false-confession testimony, and the trial court erred by holding otherwise in this case.[8]

We must next address whether defendant demonstrated a reasonable probability that his proposed expert would help his defense and whether the absence of that expert would result in a fundamentally unfair trial. See *Kennedy*, 502 Mich at 228. We hold that defendant met his burden.

Despite the Court of Appeals' contention, defendant is not required to show that he is unable to present his defense without expert assistance. The panel held that defendant was not deprived of a meaningful opportunity to present his defense because "defendant was able to present evidence and argument that his confession was false" without expert testimony. *Warner*, 339 Mich App at 148. But the defendants in *Ake* and *Kennedy* did not claim they would be unable to present a defense without an expert; rather, they identified other ways in which the expert would assist the defense and demonstrated that the lack of

---

[8] Notably, here, the trial court seemed to understand that further inquiries needed to be made as to the expert. The trial court and defendant both agreed that defendant would need to meet an indigency threshold and that, to testify, Dr. Cutler would have been subject to *Daubert*'s reliability requirements. However, once the prosecution interjected its misunderstanding that *Kowalski* stood for a categorical bar on false-confession testimony and that funding for expert witnesses required witness testimony, the trial court agreed and conducted no further inquiry.

expert assistance would render their trials fundamentally unfair. In *Kennedy*, 502 Mich at 211, the requested expert was not set to testify but was necessary to help counsel "understand the evidence" so that counsel could "confront the witnesses and evidence called in the prosecution's case in chief." *Id*. (quotation marks omitted). In *Ake*, 470 US at 72, counsel did not claim he could not raise an insanity defense without an expert but instead explained that the expert was necessary "[t]o enable him to prepare and present such a defense adequately . . . ." There, the United States Supreme Court determined that since the defendant's sanity was a "significant factor at trial," he had a due-process right to court-funded expert assistance. *Id*. at 83.

Similarly, here, defendant has established that the veracity of his confession was a significant factor at trial. Defendant's motion correctly anticipated that a major part of the prosecution's case-in-chief would be defendant's confession and sworn statements to the police. His confessions were the only corroborating evidence of the complainant's allegations. Thus, a central focus of the defense was to cast doubt on his confessions.

Defendant offered an expert in false confessions who could testify about the characteristics associated with false confessions and interviewer bias.[9] After the trial court indicated that it would only allow testimony about defendant's individualized susceptibility to coercive interviewing techniques based on his specific psychological profile, the proposed expert agreed to do the relevant testing so he could provide such testimony. Defendant explained how an expert in false confessions would support his theory that his

_____

[9] We do not address whether the trial court is required to provide funding for any of the specific experts identified in defendant's motion. If, on remand, the trial court determines that defendant is entitled to a new trial, new evidentiary motions would need to be considered in the context of the new trial.

13

confession was the product of coercion. Defendant did not merely make a "bare assertion that an expert would be beneficial," *Kennedy*, 502 Mich at 226, but supplied other facts that supported this theory, including the conditions of, and techniques employed during, his interrogations.[10] Defendant explained that the defense needed its own expert in false confessions to explain to the jury that his confession had the characteristics of coercion because, as this Court has previously recognized, "expert testimony bearing on the manner in which a confession is obtained and how a defendant's psychological makeup may have affected the defendant's statements is beyond the understanding of the average juror and may be relevant to the reliability and credibility of a confession." *Kowalski*, 492 Mich at 126 (opinion by MARY BETH KELLY, J.). Moreover, even if the expert did not ultimately testify, expert consultation could have provided defendant valuable information about how to otherwise understand evidence that would be presented to the jury, such as through providing advice regarding cross-examination of the prosecution's witnesses about their techniques. See *Ake*, 470 US at 72; *Kennedy*, 502 Mich at 211. Finally, because defendant's confessions were the only evidence presented corroborating PG's allegations

---

[10] While the dissent may not believe that "any arguable deception utilized by the police in this case" likely resulted in a false confession, *post* at 15, neither the trial court nor the jury nor anyone on this Court is an expert on false confessions, which is a subject generally "not within the ordinary person's common understanding," *Kowalski*, 492 Mich at 127 (opinion by MARY BETH KELLY, J.). "Until an expert is consulted, a defendant might often be unaware of how, precisely, the expert would aid the defense." *Kennedy*, 502 Mich at 226. Moreover, the question is not whether the confession was *actually* false, but rather, whether there is a *reasonable probability* that the expert will *assist* defendant in presenting his defense. Since defendant here was denied funding to consult an expert, it is premature to presume that such an expert would have been unhelpful to him. Instead, we limit our holding to whether defendant, if he was indigent, made a sufficient showing under *Kennedy* to be entitled to the expert funds and conclude that he made such a showing on these facts.

and because the defense theory was that those confessions were obtained through coercive tactics, the denial of defendant's request for funds to retain a false-confessions expert created a reasonable probability of a fundamentally unfair trial. Cf. *People v Stanaway*, 446 Mich 643, 695; 521 NW2d 557 (1994) (holding that an improperly admitted hearsay statement that had the effect of a confession was not harmless in a CSC case where the case amounted to a credibility contest).[11]

In sum, there was a reasonable probability that defendant's proposed expert could have assisted the jury in understanding whether the conditions for a false confession were present and, if so, how those conditions affected the interrogations. Further, without this expert, due process was not served, because the veracity of defendant's confession was a "significant factor at trial." *Ake*, 470 US at 83. Thus, defendant showed a "reasonable probability both that an expert would be of assistance to the defense and that denial of

---

[11] The dissent downplays the significance of defendant's confession on the basis of discrepancies between defendant's account of what transpired (sexual touching without any admission of penetration) and the complainant's account (penetration). However, it is clear to us that defendant's admission of sexual contact with the underage complainant— if credited by the jury—would significantly bolster the complainant's allegation of additional sexual contact. See *Stanaway*, 446 Mich at 695 ("There is little evidence that compares to the probative weight a confession carries . . . ."). To the extent that the dissent suggests that defendant is not entitled to relief based on a supposition that the jury here convicted defendant solely based on the complainant's testimony and that this testimony alone was legally sufficient to support his conviction, this reasoning improperly conflates a sufficiency analysis with the *Kennedy* due-process inquiry. The question is not whether the jury *could* have convicted defendant had his confession been sufficiently impeached, but rather whether, viewing the evidence presented at trial as a whole, there is a sufficient *probability* that the trial would be rendered "fundamentally unfair." Cf. *People v Dufek*, 510 Mich 957, 957-958 (2022) (noting that the prejudice inquiry for ineffective assistance of counsel is distinct from whether the victim's testimony was sufficient to convict); *People v Brockett*, 195 Mich 169, 179; 161 NW 991 (1917) (holding that an erroneously admitted confession was not harmless simply because there was sufficient other evidence to support a conviction).

15

expert assistance would result in a fundamentally unfair trial." *Kennedy*, 502 Mich at 227 (quotation marks and citation omitted). If defendant was indigent before trial, when he moved for funds for an expert in false confessions, his due-process rights were violated when his motion was denied.

The dissent argues that we err by considering the substantive questions of whether *Kowalski* and *Kennedy* were properly followed, rendering our opinion on those questions advisory. Of course, we assume that the dissent does not mean to say that this opinion operates as an advisory opinion in the literal sense. See MCR 7.308(B) (explaining that advisory opinions may be issued by request of the Legislature or the Governor under Const 1963, art 3, § 8). This opinion would certainly not constitute an advisory opinion because it was brought by litigating parties and not by another branch of government. Instead, the dissent appears to pejoratively refer to this as an advisory opinion out of the dissent's belief that the substantive question is not ripe for review because the threshold question of indigency has not been properly answered.

In other words, the dissent suggests that defendant has not yet suffered an actual injury, and so this Court's opinion steps beyond our constitutional bounds. We disagree.

The dissent asserts that the opinion addresses issues that are nonjusticiable because they are not ripe. "The ripeness doctrine prevents the adjudication of hypothetical or contingent claims before an actual injury has been sustained." *People v Hulben*, 489 Mich 979, 980-981 (2011) (MARILYN KELLY, J., dissenting). Ripeness is "[t]he state of a dispute that has reached, but has not passed, the point when the facts have developed sufficiently to permit an intelligent and useful decision to be made." *Black's Law Dictionary* (11th ed); see also Davis, *Ripeness of Governmental Action for Judicial Review*, 68 Harv L Rev

16

1122, 1122 (1955) ("The basic principle of ripeness is easy to state: Judicial machinery should be conserved for problems which are real and present or imminent, not squandered on problems which are abstract or hypothetical or remote."). "The opportunity for an adjudication of constitutional rights in a judicial forum . . . must remain available where there is 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant' " addressing and granting the relief being sought. *Dep't of Social Servs v Emmanuel Baptist Preschool*, 434 Mich 380, 411; 455 NW2d 1 (CAVANAGH, J., concurring), quoting *Ellis v Dyson*, 421 US 426, 433; 95 S Ct 1691; 44 L Ed 2d 274 (1975) (additional quotation marks and citation omitted). To examine ripeness, we "must balance the need for further factual development, combined with any uncertainty as to whether defendant[] will actually suffer future injury, with the potential hardship of denying anticipatory relief." *Emmanuel Baptist Preschool*, 434 Mich at 412 (CAVANAGH, J., concurring).

Considering these factors, we conclude that the issue is ripe. To start, we are not manufacturing a hypothetical question about whether defendant's due-process rights were violated. The case came to our Court by asking this very question—whether the trial court properly applied *Kowalski* and whether the Court of Appeals properly applied *Kennedy*. Further, the dominoes of errors that fell in the lower courts before this case arrived for our consideration of the due-process question demonstrate the high degree of uncertainty that we have that defendant will avoid future injury unless we now answer it. We examine those errors in chronological turn.

In the hearing addressing defendant's motion for funds to retain an expert witness, the trial court made three serious errors by (1) incorrectly reading *Kowalski* as imposing a

17

per se bar on the admissibility of expert testimony on false confessions, (2) not determining defendant's indigency status, and (3) seemingly concluding that although defendant's required showing under *Kennedy* of a "reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial" meant that Dr. Cutler's testimony had to be admissible, it was nevertheless not admissible because of *Kowalski*.[12] *Kennedy*, 502 Mich at 227 (quotation marks and citation omitted). The trial court's misapplication of *Kowalski* steered the trial court's decision away from conducting the requisite indigency inquiry and due-process analysis under *Kennedy* and toward deciding this issue with finality in favor of the prosecution. Based on a misunderstanding of what *Kowalski* requires and without any inquiry into what *Kennedy* requires, the trial court reached a decision on the merits by holding that *Kowalski* stood for a complete block on Dr. Cutler's testimony simply because it was premised on false confessions. That was incorrect, and it put the cart before the proverbial horse.

The lower courts' errors continued to compound. Whether *Kowalski* was properly interpreted and whether that affected defendant's due-process rights were the questions defendant raised in the Court of Appeals, where those issues were briefed and argued. The Court of Appeals then reached a decision on the merits. The panel noted one way in which the trial court erred by explaining that it was premature to reject Dr. Cutler's proposed testimony under *Kowalski* simply because he was an expert on false confessions. *Warner*,

---

[12] Although defendant moved for funds for two experts, during the motion hearing, defendant focused only on obtaining funds for Dr. Cutler's testimony. For ease of summarizing the events of the motion hearing, it is sufficient, here, to use the singular "expert."

339 Mich App at 147. However, this fixed just one of the issues. The Court of Appeals did not consider whether any errors requiring reversal occurred when the trial court declined to develop a record of defendant's indigency status, nor did it properly apply the *Kennedy* due-process test for assessing whether funds must be provided. With that insufficient analysis, the case was then appealed to us.

The actual issue before our Court was whether the trial court abused its discretion when it denied defendant's motion for expert funds. Thus, this appeal necessarily concerns both whether the trial court interpreted *Kowalski* correctly and whether the Court of Appeals interpreted *Kennedy* correctly. See *Warner*, 510 Mich at 936. These are not abstract questions. These issues have been litigated, caused harm, revealed confusion, and are fully ripe for our review.

The dissent is correct to note that the trial court may find, on remand, that defendant was not indigent in the first instance, and thus not entitled to the due-process protections explained in *Kennedy* and *Ake*. But given the substantial litigation that has occurred below and the confusion about the proper interpretation of those cases, defendant faces a real—not speculative—threat of having his constitutional rights thwarted if this Court does not now provide clarity about when and how to apply *Kowalski* and *Kennedy*. The lower courts have demonstrated and applied a clear misunderstanding of the applicable law. Although the dissent's proposed alternative that we vacate the lower courts' decisions while retaining jurisdiction has surface appeal, our examination of the procedural posture of this case demonstrates a misunderstanding of *Kennedy* and *Kowalski* that has already caused harm and delay in this case and may affect other cases. Moreover, the dissent would overcomplicate matters. As the dissent acknowledges, the trial court made its decision on

19

the basis of an erroneous interpretation of *Kowalski*, see *post* at 12 n 27, and the Court of Appeals opinion continued to err in interpreting *Kennedy*, *post* at 19 (noting that "portions of the opinion of the Court of Appeals are flawed"). It is incumbent on us to provide clarity.

## III. CONCLUSION

Defendant showed a reasonable probability that his proposed expert would aid his defense and that, without funding to secure such an expert, his trial would be fundamentally unfair. The proposed expert would at least have identified circumstances and techniques tending to result in false confessions, which the jury could have found applicable to defendant's confession. The confession was the only corroborating evidence for PG's allegations and was central to the prosecution's case. Moreover, the elements of a false confession are "beyond the understanding of the average juror . . . ." *Kowalski*, 492 Mich at 126 (opinion by MARY BETH KELLY, J.). Accordingly, in a trial in which the veracity of a confession is central, it is fundamentally unfair when an indigent defendant is deprived of "an adequate opportunity to present their claims fairly" by being denied funding to support necessary expert assistance on false confessions. *Kennedy*, 502 Mich at 214 (quotation marks and citation omitted). Therefore, we reverse the Court of Appeals judgment and remand this case to the Eaton Circuit Court for further proceedings not inconsistent with this opinion.

> Kyra H. Bolden
> Elizabeth T. Clement
> Richard H. Bernstein
> Megan K. Cavanagh
> Elizabeth M. Welch

20

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

No. 163805

DAMON EARL WARNER,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting in part*).

In its zeal to provide defendant a state-funded expert witness, the majority opinion brushes past an essential threshold question that must be answered in the affirmative before awarding such an entitlement: whether defendant was in fact indigent. Instead, the majority opinion goes out of its way to conclude that defendant was constitutionally entitled to the appointment of a state-funded expert on false confessions and remands this matter to the trial court for "further proceedings." By this, the majority plainly intends a remand for an indigency determination—in other words, a determination of whether the majority opinion resolves a justiciable dispute or constitutes an unconstitutional advisory opinion. This backward approach ignores the limits on our constitutional authority, flies in the face of long-established legal process, and violates fundamental principles of appellate review.

The Court has no authority to venture down the path of making legal pronouncements about factual scenarios not properly before it.[1]

In addition to my disagreement with the Court's chosen disposition as a matter of basic procedure within our constitutional limits, I also disagree with the majority's application of the *People v Kennedy*[2] standard for indigent criminal defendants' entitlement to state-funded experts. Given the record before us, defendant has not shown any violation of his due-process rights that would entitle him to a new trial. The trial court's failure to determine defendant's indigency was therefore not outcome-determinative, and I would decline to intervene in this case. I dissent, as I would deny leave to appeal.[3]

## I. FACTS AND PROCEDURAL HISTORY

A jury convicted defendant of first-degree criminal sexual conduct (CSC-I) for sexually assaulting his 13-year-old stepdaughter. The victim reported two separate incidents in which defendant assaulted her. The first was in 2011, when defendant approached her while she was sitting on her bed and "pulled down [her] pants and tried sticking his penis into [her] vagina." Although she did not remember all the details of the assault, she expressed certainty that defendant did not penetrate her. According to the

---

[1] Even assuming that defendant is indigent, it remains uncertain whether the trial court will admit any expert testimony proposed by defendant, given that any such testimony will need to pass procedural hurdles such as a *Daubert* hearing and MRE 403. See *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). If defendant is unable to present admissible expert testimony, this would presumably defeat his due-process objections to his prior conviction and bar his entitlement to a new trial.

[2] *People v Kennedy*, 502 Mich 206; 917 NW2d 355 (2018).

[3] I dissent only in part because I agree with the majority's decision to deny leave on the *nolle prosequi* issue.

victim, the second assault took place a few months later. She stated that defendant came up behind her, put his hand inside her pants, and digitally penetrated her vagina.

The victim did not disclose these incidents until December 2015,[4] when she told her mother during an argument that defendant had sexually assaulted her. This argument occurred at the house where the victim was staying with her mother and defendant. The mother did not believe the allegations and called the victim's father to pick up his daughter. The victim became upset and did not want to go with her father. At some point, defendant joined the argument and threatened the victim, telling her that he was going to slit her throat. The victim left with her father and, after that, lived full-time with her father and stepmother. Three days after this event, the victim told her father and stepmother that defendant had sexually assaulted her. It was not until January 2016, however, that the matter was brought to law enforcement; the victim reported the assaults to her school guidance counselor, who in turn reported the victim's statements to the police.

Detective James Maltby and Detective Sergeant Derrick Jordan investigated the allegations. The detectives conducted a series of three interviews with defendant. On April 4, 2016, Maltby interviewed defendant at the Eaton County Sheriff's Office. Maltby explained to defendant that he was not under arrest and was free to leave. Over the next hour or two,[5] the detective questioned defendant. Maltby later testified that he had used certain "techniques" during the interview, including withholding information from

---

[4] The victim testified that she had previously told her maternal grandmother about defendant's abuse but that she had not shared all the details.

[5] Maltby later stated that the interview took an hour, while defendant stated that it was two hours long.

defendant, empathizing and building a rapport with defendant, and "try[ing] to sexualize" the victim to make defendant more comfortable opening up about any sexual contact with her. Defendant denied any inappropriate contact with the victim, but he agreed to conduct another interview at a later date.

The second interview took place on May 5, 2016, this time conducted by Detective Sergeant Jordan. Maltby watched the interview from a closed-circuit monitor in another room. Although defendant was not under arrest, Jordan began the interview by apprising defendant of his *Miranda*[6] rights. Jordan later testified that his interview "strategy" was "to make the defendant feel comfortable speaking with [him]." According to Jordan, his "technique[s]" included relating to defendant, speaking to him "man-to-man," and "making him feel like [Jordan] understood his perspective." Jordan also stated that he used the "technique" of "blaming the victim," saying that he knew that "the victim liked" defendant and that she was "promiscuous" and "sexually active," even though he had no knowledge of the truth or falsity of these statements. He said that this approach helps "to get the defendant to talk about their action or involvement in the situation."

At some point during the interview, defendant admitted to sexual contact with the victim. According to Jordan's testimony, defendant recounted an incident in which he and the victim were "wrestling around," and she asked him if he wanted to feel her vagina. Defendant related that the victim took his hand and put it in her pajama pants and "told him that she was wet, she was horny and on fire." Defendant admitted to "tak[ing] his four fingers and feel[ing] the victim's vagina, that it was wet." Jordan wrote a statement that

---

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

4

recounted these events. Defendant checked the statement to make sure it was accurate and then signed it. This second interview lasted about two hours. Although the entire interview was not recorded, Maltby used his phone camera to record the monitor he was watching for about 10 minutes while defendant confessed.

On May 16, 2016, Maltby conducted a third interview with defendant. Maltby again tried to make defendant feel comfortable "to keep him talkin[g] and get information." He did this by telling defendant that he understood why defendant had not mentioned the "wrestling" incident during the first interview. At one point, Maltby suggested that he had defendant's DNA, which was false. He later testified that this is an interview tactic "just kind of to plant a seed" in the suspect's mind by "exaggerat[ing] some things to get people thinking in the back of their minds about DNA or, God, what if my DNA's on something . . . [?]" In response to Maltby's questions, defendant confirmed the version of the story that he had given Jordan.

Defendant was charged with criminal sexual conduct in the first and second degree. At his first trial, he testified that he came up with the story of sexually touching the victim while wrestling because he "was tired of being badgered about the same questions over and over, and they wouldn't take no for an answer. . . . [T]hey wasn't gonna quit until they got somethin' to help them." He also testified that he would sometimes wrestle with the victim, but only when the victim's mother was present.

The jury convicted defendant of CSC-II, but could not reach a verdict as to CSC-I. The prosecution chose to dismiss the CSC-I charge without prejudice, and defendant appealed his conviction of CSC-II. The Court of Appeals reversed and remanded for a new trial, agreeing with defendant that trial counsel was ineffective for failing to request a

5

specific unanimity instruction after the court told the jury that it could convict defendant of CSC-II on the basis of either of the two separate alleged incidents of sexual assault.

On remand for a new trial, defendant moved for state funding to hire an expert to testify about false confessions, asserting that he was indigent and could not hire an expert without financial assistance. He stated that, at trial, he would require expert testimony to explain "why somebody could be coerced into making a confession when they were worn down."

At the hearing on defendant's motion, the prosecution argued that expert testimony about false confessions was barred by this Court's decision in *People v Kowalski*.[7] Defendant's counsel argued that *Kowalski* did not foreclose all false-confession expert testimony. The trial court initially said that indigency and *Daubert*[8] hearings would be necessary, although the judge expressed skepticism about defendant's indigency argument given that defendant had rejected a court-appointed attorney and chosen to hire private counsel. Ultimately, however, the trial court denied defendant's motion on the basis of its view that *Kowalski* would render any false-confession expert testimony inadmissible. For this reason, the trial court never conducted an indigency hearing or reached the question of whether defendant was indigent.

The case proceeded to trial. The victim testified in detail about the two incidents in which defendant sexually assaulted her. Detective Sergeant Jordan and Detective Maltby also testified. The prosecution called and qualified Dr. Thomas Cottrell as "an expert in

---

[7] *People v Kowalski*, 492 Mich 106; 821 NW2d 14 (2012).

[8] See *Daubert*, 509 US 579.

6

the dynamics of child sexual abuse and perpetrator tactics or sex offender dynamics." The jury found defendant guilty of CSC-I and not guilty of CSC-II. Defendant appealed in the Court of Appeals, with appointed representation. The Court of Appeals affirmed defendant's conviction in a published opinion. Defendant applied for leave to appeal in this Court, and we ordered oral argument on the application.[9]

## II. STANDARD OF REVIEW

This Court reviews de novo whether "[a] defendant suffered a deprivation of his constitutional right to present a defense."[10]

## III. ANALYSIS

### A. THE MAJORITY OPINION IS AN UNCONSITUTIONAL ADVISORY OPINION

There is no dispute that defendant's due-process argument that he is entitled to a state-funded expert witness cannot succeed without a finding of indigency.[11] I cannot agree with the majority opinion's course of deciding the legal question first and only then remanding for an indigency determination.[12] Simply, at present, there is no "justiciable

_____

[9] *People v Warner*, 510 Mich 936, 936 (2022).

[10] *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009).

[11] See *Kennedy*, 502 Mich at 213-218.

[12] In an attempt to dodge criticism about its backward approach to resolving this case, the majority opinion fails to provide clear instruction to the trial court as to what it must do on remand. While the opinion simply remands the case to the trial court "for further proceedings not inconsistent with this opinion," it is beyond clear from the opinion's reasoning that, on remand, the trial court must first conduct a hearing to determine whether defendant was indigent when he sought funding for an expert. The majority hides this mandate instead of fully standing behind its chosen resolution. I will refer to the ordered remand for what it obviously is—a remand for an indigency hearing. Once that portion of the proceedings on remand is complete, the trial court is seemingly required to then apply

7

controversy" that would allow the majority to resolve the merits of defendant's due-process argument in his favor.[13]

The majority's resolution of a legal question not currently presented by the facts of the case exceeds the judicial power granted in our Constitution, because "this Court is not constitutionally authorized to hear nonjusticiable controversies."[14] The " 'judicial power . . . is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction.' "[15] We have consistently maintained that justiciability requirements are mandated by the limits of our constitutional judicial power.[16]

The justiciability doctrine that applies to the case at hand is ripeness. Under the ripeness doctrine, a party must have sustained an actual injury to bring a claim, and a party may not premise an action on a hypothetical future controversy.[17] "Perhaps the most critical element of the judicial power has been its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical,

---

the majority opinion's premature due-process analysis if it finds that defendant was indigent or else discard the Court's opinion as unnecessary if it finds that he was not.

[13] *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 294; 715 NW2d 846 (2006).

[14] *Id*.

[15] *People v Richmond*, 486 Mich 29, 34; 782 NW2d 187 (2010), quoting *Anway v Grand Rapids R Co*, 211 Mich 592, 610; 179 NW 350 (1920) (some quotation marks omitted).

[16] *Federated Ins Co*, 475 Mich at 292 ("With regard to the necessity of a justiciable controversy, it derives from the constitutional requirement that the judiciary is to exercise the judicial power and only the judicial power.") (quotation marks omitted). See Const 1963, art 6, § 1 (vesting "the judicial power" in the courts of this state).

[17] *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 554; 904 NW2d 192 (2017).

dispute . . . ."[18] As the Court has long accepted, " '[i]t is well settled that a court will never entertain a suit to give a construction or declare the rights of parties upon a state of facts which has not yet arisen, nor upon a matter which is future, *contingent* and uncertain.' "[19] Accordingly, an issue is unripe and nonjusticiable when the claim is contingent on facts that have not yet arisen.[20]

Here, defendant's argument that he was denied constitutional due process depends on a hypothetical future determination that he was indigent.[21] Because a necessary fact underlying the majority opinion's legal analysis is not established, but hypothetical, the majority opinion is an advisory opinion.[22] Further, it may well be that, on remand, the trial

---

[18] *Federated Ins Co*, 475 Mich at 292 (quotation marks and citation omitted).

[19] *Anway*, 211 Mich at 611, quoting *Wahl v Brewer*, 80 Md 237; 30 A 654 (1894).

[20] *Federated Ins Co*, 475 Mich at 292; *Anway*, 211 Mich at 610-611; *Van Buren*, 319 Mich App at 554.

[21] *Kennedy*, 502 Mich at 213-218.

[22] I obviously do not assert that the majority opinion qualifies as an advisory opinion in the narrow sense permitted by the Michigan Constitution, which allows either house of the Legislature or the Governor to request this Court's opinion "on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date." Const 1963, art 3, § 8; see also MCR 7.308(B). Instead, I use the term "advisory opinion" according to its common usage in the context of justiciability. As the United States Supreme Court and other federal courts have thoroughly explained, an advisory opinion is a decision on a legal issue based on hypothetical facts or on facts otherwise not properly presented by the case at hand. See, e.g., *Chafin v Chafin*, 568 US 165, 172; 133 S Ct 1017; 185 L Ed 2d 1 (2013) ("Federal courts may not . . . give 'opinion[s] advising what the law would be upon a hypothetical state of facts.' "), quoting *North Carolina v Rice*, 404 US 244, 246; 92 S Ct 402; 30 L Ed 2d 413 (1971) (alteration in original); *Camreta v Greene*, 563 US 692, 717; 131 S Ct 2020; 179 L Ed 2d 1118 (2011) (Kennedy, J., dissenting) ("The judicial Power is one to render dispositive judgments, not advisory opinions.") (quotation marks and citation omitted); *Herb v Pitcairn*, 324 US 117, 126; 65 S Ct 459; 89 L Ed 789 (1945) (observing that the Supreme Court is "not permitted

court will determine that defendant was not indigent when he moved for expert funding.[23]

Such a determination would moot defendant's claim of error and render the majority opinion's merits analysis irrelevant to the resolution of the case. What is already an improper advisory opinion would then become completely unmoored from even hypothetical facts and never have any bearing whatsoever on a real-world dispute.[24]

---

to render an advisory opinion" and that if the same judgment would be rendered below even after the correction of a legal error, "our review could amount to nothing more than an advisory opinion"); *Westport Ins Corp v Bayer*, 284 F3d 489, 499 (CA 3, 2002) ("A judgment beyond the issues presented constitutes an advisory opinion."); *Briggs v Ohio Elections Comm*, 61 F3d 487, 493 (CA 6, 1995) (observing that the court must "avoid issuing advisory opinions based upon hypothetical situations"). As discussed earlier in this opinion, Michigan courts, like federal courts, must avoid deciding legal issues based on hypothetical facts. See *Federated Ins Co*, 475 Mich at 292; *Anway*, 211 Mich at 610-611; *Van Buren*, 319 Mich App at 554. That is, we must not issue advisory opinions outside the narrow class of advisory-opinions-upon-request that are authorized by Const 1963, art 3, § 8.

[23] Indeed, at the hearing on defendant's motion, the trial court expressed skepticism about defendant's claim of indigency, given that defendant had chosen to dismiss his court-appointed counsel in favor of retaining private counsel.

[24] In asserting that it is not addressing an unripe issue because the trial court's erroneous *Kowalski* analysis itself harmed defendant, the majority opinion conflates an error with an injury. Even though the trial court erred in its expert-witness analysis, see note 30 of this opinion, the majority opinion can identify no potential injury from this legal error without hypothetical future facts, specifically the fact of indigency. A "widespread misunderstanding" of a case and substantial litigation and confusion simply do not themselves constitute an actual injury. While it may be true that the procedural posture of this case is complicated due to lower-court errors, this does not mean that this Court should further complicate the case by stretching to reach issues not yet ready for consideration. Similarly, simply because the parties have appealed an issue and presented the case in a certain manner does not mean that this Court should blindly answer the precise question presented when it is not yet appropriate to do so. It is obvious that a majority of this Court is eager to provide guidance as to how to properly apply *Kowalski* and *Kennedy*. But today's decision will only add to the confusion.

Apparently eager to grant defendant relief on the potential substantive issue presented in this case, the majority opinion ignores justiciability constraints by deciding the legal impact of defendant's indigency while the existence of any such indigency is uncertain and speculative. For the reasons that follow, because I conclude that defendant would not be entitled to relief even if he were to be found indigent, I would simply deny leave to appeal. The trial court's failure to determine defendant's indigency is not outcome-determinative, and I would decline to intervene in this case.

Simply put, denial of defendant's application for leave to appeal is the appropriate outcome in this matter. But if the majority is dead set on remanding to the trial court for an indigency hearing, it should do so without getting ahead of itself and deciding the legal consequences of the indigency. Instead of holding that defendant is constitutionally entitled to relief, but *only if* he is found to be indigent on remand, the Court should instead remand for the trial court to determine defendant's indigency status while retaining jurisdiction. Then, if defendant is found to meet that threshold requirement for receiving a state-funded expert, the Court could proceed to consider whether defendant is entitled to relief based on the denial of his motion for expert-witness funds. I question the feasibility of such a post hoc indigency hearing,[25] but if the majority insists on remanding for such a

---

[25] There is no court rule or statute that specifically applies to a post hoc indigency hearing like the one required by the majority opinion's remand. MCR 6.005(B), which applies to a defendant's request for an attorney, sets out factors for a court to consider when making an indigency determination if that determination is not made by the indigent criminal defense system pursuant to MCL 780.991(3). But defendant never applied for appointed counsel. He retained counsel and simply sought funding for an expert. It is therefore unclear whether MCR 6.005(B) and MCL 780.991(3) are even applicable in this context. But to the extent that they are, a post hoc indigency hearing under MCR 6.005(B) would seemingly be replete with practical difficulties. That rule uses the present tense when

11

hearing, well-settled principles of justiciability dictate that indigency be established *before* reaching the substantive issue and deciding defendant's expert-witness argument in his favor.

### B. DEFENDANT HAS NOT SHOWN ENTITLEMENT TO A STATE-FUNDED EXPERT ON FALSE CONFESSIONS

Even if the trial court were to find that defendant was indigent when he filed his motion for expert-witness funds, I agree with the Court of Appeals that defendant would not be entitled to relief. In *Kennedy*, this Court set forth the standard for entitlement to an expert witness provided at the state's expense. The question under *Kennedy* is whether there is a "reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial."[26] Defendant asserts, and the majority opinion accepts, that if defendant was indeed indigent at the time he moved for a state-funded expert witness to testify generally about false confessions, the failure of the trial court to appoint such an expert so inhibited the defense that it violated defendant's constitutional right to due process. I disagree.[27]

---

instructing the trial court as to which factors and information are relevant to an indigency determination. The pertinent question in this case is not whether defendant is *currently* indigent, but whether he was indigent when he sought funding for an expert on August 19, 2019. It is not clear to me how defendant will establish, or how the trial court is to determine, whether defendant was indigent almost five years ago, especially if information from that time is inaccessible.

[26] *Kennedy*, 502 Mich at 228 (quotation marks and citation omitted).

[27] As the majority opinion notes and the Court of Appeals observed, the trial court cited an erroneous basis for denying defendant's request for expert-witness funds. Contrary to the trial court's statements on the record, *Kowalski* does not create a categorical bar to false-confession expert testimony. See *Kowalski*, 492 Mich at 141-144 (opinion by MARY BETH KELLY, J.). Instead, it simply affirmed a trial court's ruling after a *Daubert* hearing that a

12

First, defendant has failed to show that there is a reasonable probability that an expert would be of assistance to the defense. Defendant's false-confession theory is that he was so badgered, so "worn down" by police questioning, that he offered up a fictional narrative of the crime so that his interviewer would leave him alone. But defendant offered nothing more than ipse dixit to support this assertion, and the facts of this case simply do not appear to support his theory.[28]

The majority opinion summarily accepts that the police interview techniques employed in this case were "questionable" and improper and that a total of six hours of police interviews on three separate days over a period of more than a month is suggestive of a coerced confession.[29] There is no authority for these propositions. It is true that the

---

particular false-confession expert's methodology was not reliable. *Id*. Still, the trial court's error does not by itself require reversal or entitle defendant to a state-funded expert witness or a new trial. See *People v Lyon*, 227 Mich App 599, 612-613; 577 NW2d 124 (1998) (stating that lower-court rulings will be affirmed if they reach the right result for the wrong reason).

[28] The majority opinion argues that the scope of its analysis is "limited to the question of whether the trial court erred when it denied defendant's motion to appoint Dr. Cutler" and suggests that "coerced" statements or "investigators' techniques" are not relevant to this question. This framing is curious, given that defendant's motion to appoint Dr. Cutler as an expert was premised on a theory that the police used inappropriate techniques to effectively coerce defendant into giving a false confession. Under the *Kennedy* standard, whether there is a reasonable probability that a false-confession expert would assist the defense and whether a defendant's trial would be fundamentally unfair without such an expert necessitates evidence supporting a defendant's theory of a false confession. Without supporting evidence, defendant's theory would be a "bare assertion," which cannot entitle him to expert assistance. *Kennedy*, 502 Mich at 226.

[29] Defendant's supplemental brief states that "[i]n total, the interrogation lasted for approximately six hours[.]" This is misleading insofar as it suggests an unduly onerous and exhausting interrogation. The "approximately six hours" of police interviews took place on three separate dates between April 4 and May 8, 2016, with no single interview alleged to have lasted more than an estimated two hours.

13

interviewing officers used "techniques" to make defendant comfortable and more willing to talk. They treated defendant with expressions of concern, sympathy, and understanding so that he would open up. But defendant has not shown that this treatment, and arguable deception, leads to a conclusion that the officers' conduct was coercive or likely to lead to a coerced confession. Indeed, defendant's own arguments are contradictory, as he seems to fault his interviewers for both coercively wearing him down by badgering him with questions and tricking him into confessing by treating him with sympathy and understanding.

Defendant's brief in this Court concedes that, during the interview in which defendant confessed, Detective Sergeant Jordan did not force or threaten defendant, that defendant never said he wanted to leave or did not want to talk with Jordan, and that defendant was free to leave at any time during the interview. The majority opinion does not persuasively explain how two hours of police questioning in which the interviewer expressed sympathy for the suspect, did not pressure the suspect, and attempted to minimize the suspect's actions and in which the suspect knew he was free to leave at any time could have "worn down" the suspect to the point that he made a false confession in order to end the conversation.

To determine whether a statement was made involuntarily because of coercion, a reviewing court considers "whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made."[30] Relevant circumstances include the consideration of

---

[30] *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).

14

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.[31]

While this standard is not directly applicable in determining whether a confession was falsely made, there is logically much overlap between the involuntariness factors and any false-confession analysis in a case like this one, where the purported false confession is claimed to be the result of police coercion. Looking at these factors, I do not believe that any arguable deception utilized by the police in this case constitutes the type of coercion that would render a confession involuntary. It is noteworthy that the majority opinion cannot point to the presence of any of these factors, or similar coercive conduct, to support defendant's argument that his confession was not freely made.[32] To be clear, a defendant need not definitively establish that his confession was not freely and voluntarily made in order to be entitled to a false-confession expert. But in light of defendant's failure to support his assertion that his confession was false, the application of these factors demonstrates that there does not "exist[] a reasonable probability . . . that an expert would be of assistance to the defense . . . ."[33]

---

[31] *Id.*

[32] Moreover, it is worth considering whether any of the coercive elements that defendant claims existed in the third interview are even relevant, given that defendant confessed during the second interview.

[33] *Kennedy*, 502 Mich at 228 (quotation marks and citation omitted).

Because the majority opinion does not explain why the facts in the record sufficiently support defendant's false-confession theory, it is impossible to know what police may do when interviewing a suspect without potentially creating entitlement to a state-funded false-confession expert. Perhaps the mere fact of police questioning would adequately raise the specter of a false confession, although such an apparent per se rule of entitlement to a state-funded expert would conflict with our statements in *Kennedy*.[34] At any rate, we are left with uncertainty about what police actions could entitle a defendant to a state-funded false-confession expert. In short, defendant has identified no evidence to suggest that his confession was false or the product of coercion; instead, defendant essentially asks for an expert to help him create and flesh out an argument supported by nothing more than his own bare assertions. He is not constitutionally entitled to a state-funded expert to expound on that theory.[35]

Moreover, even assuming that defendant has sufficiently shown that a false-confession expert would be beneficial to his case, he has not shown that his trial was fundamentally unfair without state funding for such an expert. In other words, defendant has not shown "why the particular expert is necessary."[36] Rather than asserting that Dr. Cutler's testimony was necessary to simply help prepare the defense, defendant specifically

---

[34] See *id*. at 226 ("[A] defendant's bare assertion that an expert would be beneficial cannot, without more, entitle him or her to an expert; *otherwise, every defendant would receive funds for experts upon request*.") (emphasis added). The majority instead indicates that a defendant is entitled to funding for expert assistance in every trial in which "the veracity of a confession is central . . . ."

[35] *Id*.

[36] *Id*. at 227 (quotation marks and citation omitted).

asserts that Dr. Cutler's testimony was necessary to explain to the jury why someone might be coerced into making a false confession. But without any indication as to how Dr. Cutler may have testified, it is difficult to say that defendant's trial was fundamentally unfair without his testimony.

Additionally, the majority opinion emphasizes that defendant's confession was "the only corroborating evidence" of the victim's allegations. But any corroborative value from defendant's confession was arguably lessened by its differences from the victim's version of events. The majority opinion ignores that the details of defendant's confession largely contradicted the victim's testimony rather than corroborated it. Any corroborative value that defendant's confession had for the victim's testimony is undermined by the contradictions between the versions of events offered by the victim and defendant, respectively. The victim testified that defendant digitally penetrated her, while defendant's confession recounted sexual touching without any specific admission to penetration. The crime of which defendant was convicted, CSC-I, requires penetration.[37] The record thus suggests that the jury deemed the victim's version of events to be credible and relied on her account rather than the one contained in defendant's confession. From all this, I cannot agree that the lack of a state-funded false-confession expert to testify generally about false confessions created a "reasonable probability" that defendant received a "fundamentally

---

[37] MCL 750.520b(1).

17

unfair trial."[38]  This is especially true where, as discussed, defendant did little to show that an expert would be beneficial to his defense.[39]

## IV.  CONCLUSION

I disagree with the majority's issuance of what is essentially an advisory opinion.  It is inappropriate for the majority opinion to decide the legal impact of defendant's indigency while the existence of any such indigency is uncertain and hypothetical.  Moreover, I disagree with the majority opinion's resolution of the substantive legal issue that it was so

---

[38] *Kennedy*, 502 Mich at 226.  In holding that defendant's trial was not fundamentally unfair, the Court of Appeals relied on the fact that defendant was able to present other evidence that the confession was false.  While the extent that a defendant is able to produce a defense without an expert might be a factor to consider when analyzing the *Kennedy* factors, the Court of Appeals erred to the extent it implied that this consideration is dispositive.  Similarly, the fact that the prosecution's expert was not going to address the issue of the confession, but rather unrelated issues, is relevant to, but not dispositive of, the analysis.  It is at least noteworthy here that defendant was not denied the ability to directly counter a prosecution expert.

[39] The majority contends that without expert assistance, "due process was not served, because the veracity of defendant's confession was a 'significant factor at trial,' " quoting *Ake v Oklahoma*, 470 US 68, 83; 105 S Ct 1087; 84 L Ed 2d 53 (1985).  I question whether the "significant factor" language from *Ake* should be applied to *all* requests for expert funding.  Notably, *Kennedy* did not broadly adopt this language.  *Ake* addressed the issue of sanity, holding "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 US at 83.  Given the unique and complex nature of an insanity defense, it seems that an expert will almost always be required to either testify about sanity or at least provide the defense with the expertise to rebut the prosecution's expert.  On the other hand, while expert testimony may often be helpful in understanding the psychology surrounding false confessions, see *Kowalski*, 492 Mich at 126 (opinion by MARY BETH KELLY, J.), I question whether it will always be necessary.  In short, it is not clear to me that the "significant factor at trial" language used in *Ake* should be automatically applied to *Kennedy*'s second requirement.

eager to reach. I do not believe that defendant has sufficiently shown that there is a reasonable probability that an expert would be of assistance to his defense, nor can he show that his trial was fundamentally unfair without a state-funded expert witness. Defendant is therefore not entitled to relief, even if he was indigent at the time that he filed his motion for expert funding. Consequently, while portions of the opinion of the Court of Appeals are flawed, the panel reached the correct result. I would deny leave to appeal.

Brian K. Zahra<br>
David F. Viviano